## QUEEN CITY TELEPHONE CO. v. CINCINNATI (CITY).

1. UNDERGROUND TELEPHONE SYSTEM NOT AUTHORIZED BY LAN. R. L. 5602 (B. 3471-1), WHEN.

A telephone company cannot construct and maintain underground wires and pipes, or conduits, and other fixtures for containing, protecting and operating such wires in the streets and public ways of a municipality of this state, under favor of Lan. R. L. 5602 (B. 3471-1), unless it owns and operates an exchange within such municipality. Said statute applies to companies in existence at the time of its enactment, as well as to those thereafter coming into existence.

2. LANING R. L. 5574 AND 5577 (R. S. 3454 AND 3461-1) ONLY AUTHORIZE OVER-HEAD TELEPHONE SYSTEM.

The overhead construction, only, of telephone lines in the streets and public ways of the municipalities of this state, is authorized by Lan. R. L. 5574 and 5577 (R. S. 3454 and B. 3461-1).

3. TELEPHONE COMPANY MUST PROVE CORPORATE EXISTENCE TO MAINTAIN ACTION UNDER LAN. R. L. 5587 (R. S. 3461).

The corporate existence of a telephone company, and its organization by the election of directors, is a condition precedent to its right to have the probate court fix the mode in which its lines of wire shall be con-structed in the streets of a municipality under Lan. R. L. 5587 (R. S. 3461).

4. PROBATE COURT CANNOT MAKE GENERAL REGULATIONS AS TO USE OF ALL STREETS BY TELEPHONE COMPANY UNDER LAN. R. L. 5587 (R. S. 3461).

While all the streets of a municipality may be subjected to the use of telephone lines by the probate court under favor of Lan. R. L. 5587 (R. S. 3461), nevertheless the statute does not contemplate that the court shall make general regulations as to all the streets, but on the contrary each street must be separately taken into consideration, and a definite order made with respect to its particular use. The judgment of the court must be a judicial determination according to established rules and practice, and not a general grant as to the use of all the streets, because the latter would be legislative in character, and beyond the constitutional power of the court.

5. DECREE OF COURT MUST BE RESULT OF JUDICIAL DETERMINATION TO BE VALID.

A so-called "decree" of the probate court directing the mode in which a telephone line shall be constructed in the streets of a municipality, but which is neither a judicial determination of any judicial question in-volved in the proceeding, nor a finding and judgment thereon, nor a decree in substance or in form, but on the contrary is nothing more than an ordinance or act of legislation, is a nullity, and without any force of effect whatever.

6. STATUTE MUST BE READ IN LIGHT OF CONDITIONS EXISTING AT TIME OF EN-ACTMENT.

It is a well settled rule of statutory construction that a statute must be read in the light of the conditions that existed at the time of its enact-ment, in order to ascertain the meaning of the legislature; and, with

## Hamilton County.

reference to the common ordinary way in which telephone lines were constructed and used at the time of the passage of a statute regulating their construction and use, the courts will take judicial notice of such conditions.

ERROR to Hamilton common pleas court.

**C. B. Matthews** and **Powell Crosley,** for plaintiff in error.

**C. J. Hunt,** city solicitor, for defendant, cited:

*Zanesville* v. *Telegraph & Tel. Co.* 64 Ohio St. 67 [59 N. E. Rep. 781; 83 Am. St. Rep. 725]; *State* v. *Bridge Co.* 54 U. S. (13 How). 518 [14 L. Ed. 249]; *Canada Northern Ry.* v. *Bridge Co.* 7 Fed. Rep. 653; *Zanesville* v. *Telephone & Tel. Co.* 63 Ohio St. 442, 443 [59 N. E. Rep. 109]; 26 Am. & Eng. Enc. Law (2 ed.) 611; 27 Am. & Eng. Enc. Law (2 ed.) 1002; *Edison General Elec. Co.* v. *Cincinnati (City),* Goebel 304; *Cin. & S. G. Ave. St. Ry.* v. *Cumminsville,* 14 Ohio St. 523; *State* v. *Railway,* 24 O. C. C. 609; *Railway* v. *Cincinnati,* 66 Ohio St. 639 [65 N. E. Rep. 1132]; *State* v. *Railway,* 37 Ohio St. 157; *State* v. *Murphy,* 170 U. S. 78 [18 Sup. Ct. Rep. 505; 42 L. Ed. 955]. See also, *Circleville Light & Power Co.* v. *Gas Co.* 69 Ohio St. 259 [69 N. E. Rep. 436]; *Chamberlain* v. *Railway,* 15 Ohio St. 225; *Raymond* v. *Railway,* 10 Dec. Re. 416 (21 Bull. 103); Lewis, Em. Dom. Secs. 254, 391; *Miami Coal Co.* v. *Wigton,* 19 Ohio St. 560; *Currier* v. *Railway,* 11 Ohio St. 228; *Platt* v. *Pennsylvania Co.* 43 Ohio St. 228 [1 N. E. Rep. 420]; *Atlantic & O. Ry.* v. *Sullivant,* 5 Ohio St. 276; *Atkinson* v. *Railway,* 15 Ohio St. 21; *Powers* v. *Railway,* 33 Ohio St. 429; *State* v. *Insurance Co.* 49 Ohio St. 440 [31 N. E. Rep. 658; 34 Am. St. Rep. 573]; Marshall, Corporations Sec. 511.

**J. W. Warrington,** for defendant, cited:

*Zanesville* v. *Telegraph & Tel. Co.* 64 Ohio St. 67 [59 N. E. Rep. 781; 83 Am. St. Rep. 725]; *Macklin* v. *Telephone Co.* 24 O. C. C. 446; *Circleville Light & Power Co.* v. *Gas Co.* 69 Ohio St. 259 [69 N. E. Rep. 436]; *Brush Elec. Light Co.* v. *Electric Co.* 3 Circ. Dec. 168 (5 R. 340), affirmed by Supreme Court, *Brush Elec. Light Co.* v. *Electric Co.* 29 Bull. 72; *Cin. Inc. Plane Ry.* v. *Telegraph Assn.* 48 Ohio St. 390 [27 N. E. Rep. 890; 12 L. R. A. 534; 29 Am. St. Rep. 559]; *State* v. *Insurance Co.* 49 Ohio St. 440 [31 N. E. Rep. 658; 34 Am. St. Rep. 573]. That case was not modified by *Hessler* v. *Punch & Shear Works Co.* 61 Ohio St. 621 [56 N. E. Rep. 469]; *Powers* v. *Railway,* 33 Ohio St. 429; *Zanesville* v. *Gas Light Co.* 47 Ohio St. 1 [23 N. E. Rep. 55].

**Miller Outcalt,** for defendant, cited:

*Zanesville* v. *Telegraph & Tel. Co.* 64 Ohio St. 67 [59 N. E. Rep. 781; 83 Am. St. Rep. 725]; Lan. R. L. 5602 (R. S. 3471-1).

Telephone Co. v. Cincinnati.

**H. D. Peck,** for defendant, cited:

*Ash v. Ash,* 9 Ohio St. 383; *Tyler v. Winslow,* 15 Ohio St. 364; *Hamilton v. Steamboat,* 16 Ohio St. 428; *Stannard v. Case,* 40 Ohio St. 211; *Collins v. Millen,* 57 Ohio St. 289 [48 N. E. Rep. 1097]; *Conger v. Barker,* 11 Ohio St. 1; *Boley v. Insurance & Tr. Co.* 12 Ohio St. 139; *Dutoit v. Doyle,* 16 Ohio St. 400; *Brower v. Hunt,* 18 Ohio St. 311; *Commonwealth v. Warwick,* 185 Pa. St. 623 [40 Atl. Rep. 93]; *Brown v. Piper,* 91 U. S. 37 [23 L. Ed. 200]; *Phillips v. Detroit,* 111 U. S. 604 [28 L. Ed. 532]; *King v. Gallun,* 109 U. S. 99 [27 L. Ed. 870]; *State v. Board of Pub. Works,* 36 Ohio St. 409; *State v. Railway,* 37 Ohio St. 157; *State v. Chase,* 5 Ohio St. 528; *Powers v. Railway,* 33 Ohio St. 429; *Atlantic & O. Ry. v. Sullivant,* 5 Ohio St. 276; *Atkinson v. Railway,* 15 Ohio St. 21; *Miami Coal Co. v. Wigton,* 19 Ohio St. 560; *Toledo & W. Ry. v. Daniels,* 16 Ohio St. 390; *Platt v. Pennsylvania Co.* 43 Ohio St. 228 [1 N. E. Rep. 420]; *State v. Insurance Co.* 49 Ohio St. 440 [31 N. E. Rep. 658; 34 Am. St. Rep. 573]; *Kent v. Bierce,* 6 Ohio 336; *Collier v. Johnson,* 7 Ohio (pt. 1) 235; *State v. Blake,* 2 Ohio St. 147; *Moore v. Given,* 39 Ohio St. 661; *Railway v. Jump,* 50 Ohio St. 651 [35 N. E. Rep. 1054].

## SWING, J.

This is an action in this court on error to the judgment of the court of common pleas of Hamilton county, reversing a judgment of the probate court of said county.

The action in the probate court was one brought by the telephone company in which it is alleged it was a corporation—

"Organized and doing business under the laws of the state of Ohio, for the purpose of constructing, operating and maintaining lines of telephone and telegraph, with the necessary poles, conduits, wires and appurtenances, in the city of Cincinnati, Hamilton county, state of Ohio, and the defendant is a municipal corporation under the laws of this state, and a city.

"That on or about October 12, 1903, this plaintiff, the Queen City Telephone Company, made application to the city council of the city of Cincinnati, under the laws of the state, to prescribe a manner of use by this company of the streets, alleys and public ways and other public property of the said city, in constructing the plaintiff's lines of telephones and telegraph, and transmitted at the same time the form of an ordinance that this company was willing to accept, and bind itself to perform and conform to.

Hamilton County.

"That immediately at the meeting of said council on October 12, 1903, the said application was referred to the committee on telephones and telegraphs of said city council, who have kept the same under consideration until January 25, 1904, and during the said interval the said committee had several meetings, and several times considered said application, together with applications of other companies, and has finally reported that there was not room in the streets for the accommodation of the lines asked for and that it was not expedient to make any grant or agreement.

"And the said city council on January 25, 1904, took up and considered the said report and adopted the same, and has finally rejected the application of this company, and the said city of Cincinnati and this plaintiff have failed to agree on the mode of the use of the streets, alleys, public ways and other public property of the city of Cincinnati in constructing this company's lines of telephone and telegraph, although this plaintiff has been, and is willing to accept the said permission upon any terms and conditions prescribed by the said city council, that may be proper and lawful for it to prescribe, or to accept and bind itself to any amendment which might be lawful and proper to the proposal presented by this plaintiff, of all of which the said city council had knowledge and notice.

"Wherefore the plaintiff asks that this court direct in what mode this plaintiff may construct its telephone and telegraph lines, along the streets, alleys, public ways and public property of the said city of Cincinnati, so as not to incommode the public in the use of the same.

"THE QUEEN CITY TELEPHONE COMPANY,

"HARRY B. GATES, Secretary,

"C. B. MATTHEWS, Attorney.

"(Duly verified.)"

To this partition the city of Cincinnati filed the following motion:

"Now comes the defendant and moves that the petition of the plaintiff be made more definite and certain in the following respects:

"1. By setting out what streets, public ways and public property plaintiff proposes to occupy with the poles, wires and underground conduits.

"2. By setting forth the exact location of all proposed poles, wires, conduits and other structures to be placed in said streets, alleys and public ways in the city.

"3. By setting forth specifically the character of the poles or

Telephone Co. v. Cincinnati.

wires to be erected and of the conduits and other structures proposed to be put upon, in or under the streets and public ways in the city of Cincinnati.

"CITY OF CINCINNATI,
"By CHARLES J. HUNT, Solicitor."

Which motion the court overruled.

Afterwards the said city filed its answer alleging:

"Now comes the city of Cincinnati, and by way of answer to the petition, admits that plaintiff submitted to the council of the city of Cincinnati the ordinance set forth in the petition, and asked said council for the consideration and passage thereof.

"This defendant further says that said ordinance and application for the passage thereof was referred by council to the committee on telephones, telegraphs and conduits in connection with the application of three other alleged companies for passage of similar ordinances; that said committee, after a full consideration thereof, on January 25, 1904, made the following report:

"Cincinnati, January 25, 1904.

"To the Honorable, the Council of the City of Cincinnati.

"Gentlemen:

"You have referred to the committee on telephones, telegraphs and conduits the applications for the rights or franchises in the streets of the city of Cincinnati for telephone purposes, filed by the Cincinnati Telephone Company, the Interstate Telephone Company, the Queen City Telephone Company and the Fitzsimmons Telephone Company, together with the several proposed ordinances prepared by said companies and filed with their applications.

"Your committee has had numerous public meetings, at which the representatives of the above mentioned companies were heard, as well as the representatives of the Cincinnati & Suburban Bell Telephone Company, with all the evidence which said companies saw fit to present. Said evidence is quite voluminous and is returned with this report.

"Your committee has not considered the question of law, as to whether or not the granting by the city of a right or franchise in the streets of the city, for telephone purposes, to each and every company that may apply therefor, is mandatory upon the city's authorities, or what would be the legal result of a refusal to grant any franchises, but have considered upon broad principles of public policy, convenience and safety, whether or not, under the conditions as they now exist in the city

of Cincinnati, it would be advisable for the city authorities to grant any or all of the applications as made. In the consideration of this matter, your committee has called to its assistance the city engineer, Mr. H. J. Stanley, and the city electrician, Mr. Weissleder, and has caused a plat to be prepared, showing all the uses to which the streets of the city are now subject.

"Such plat and the evidence offered pertaining thereto show that in the various streets of the city there is a network of telephone, telegraph and electric light conduits, gas, sewer and water pipes, with the various manholes and fire cisterns used in connection thereof; that at the intersection of the principal streets such conduits, pipes and manholes now occupy so great a proportion of the street that it would be dangerous, if not impossible, to permit a further use of the street for such purposes, and, in view of the uniform custom existing in the city of Cincinnati to permit the property owners to utilize the space underneath the sidewalk, as far as the curb, for the purposes of their buildings the space available for conduit purposes is confined to the surface underneath and between the two curbs. Moreover, the principal streets of the city have been permanently improved, and to permit their disturbance beyond the necessities therefor, which even now interfere with their usefulness, would only subject the public to an inconvenience and annoyance, from which, if possible, they should be protected.

"It is not to be presumed that the city of Cincinnati in its continued growth will not need in such principal streets additional facilities for sewer and water purposes, and whatever space is now left unutilized for conduit and other subterranean purposes will certainly be used in the future for the ordinary demands of municipal life, independent of any new system of underground telephone conduits. One of the facts inquired into by your committee has been whether or not there is a demand at the present time for an additional and independent system of telephones for public and private use. Although much has been said before this committee by the representatives of the above named applicant companies, yet there has been no evidence on the part of the people generally of any desire for a double telephone system. On the contrary, the users of telephones within the city, so far as it is shown by any evidence before this committee, have been opposed to the establishment in the city of any such double telephone system.

"The present applicants, with the exception of the Fitzsimmons Company, whose franchise is doubtful and who have only a few lines connecting depots and hotels, used mainly for cab purposes, have no lines within the city limits. They are constituted for nonresidents of the

city, and their financial standing and ability to establish in the city of Cincinnati any satisfactory telephone service has not been conclusively established to your committee.

"Only one of the companies, the Queen City, has presented any evidence of prospective subscribers or users of its telephone. Of a list of 954 persons given as prospective subscribers to the Queen City Telephone Company, 77 are residents of Covington, Newport, and cities and villages other than Cincinnati, and 620 already have telephones, leaving only 334 to be supplied with telephone accommodations with which they are not already provided.

"It further appears that the above prospective subscribers were obtained under contracts or promises by which no charge was to be made for telephones until ten thousand subscribers therefor had been obtained.

"Another important fact, in consideration of this question, is the present telephone service in Cincinnati. The city of Cincinnati was one of the first cities to avail itself of the use of the telephone, and the company introducing such use has been in charge of our system from the beginning. It has, in all the requirements of telephone service, kept up with the demands of the hour. There is no evidence that telephone service in any city is superior to that of Cincinnati. Without compulsion on the part of the city it has placed its wires in underground conduits as rapidly as could be expected, and the principal streets have substantial and improved conduits for the wires of such company. It has some twenty thousand telephones in use in Cincinnati and vicinity, and its facilities have been increased during the past year, so as to permit an increase in the number of its subscribers at the rate of about four hundred per month. There seems to be no complaints as to the service furnished by the local company, except as to such inconveniences as necessarily accompany the operation of any telephone system.

"The rates charged by the present company compare favorably with the rates charged by companies in other large cities in the country for similar service, and such rates have, from time to time, been voluntarily reduced or modified by the company as business expediency indicated. In the adoption and substitution of improved apparati or methods the company has kept pace with the inventions of the age. Its long-distance service, by reason of its double metallic circuit, has been satisfactory, while the long-distance service promised by any of the applicant companies, in view of their lack of substantial lines, even where in operation outside of Cincinnati, would never be satisfactory to the citizens of Cincinnati after having been accustomed to the effi-

cient service of the local company. The evidence further shows that the local company, wherever satisfactory long-distance service can be had through companies in operation outside of Cincinnati, the local company has been willing, upon reasonable terms, to make arrangements for exchange of service.

"It is almost universally conceded that in localities where two telephone systems are in operation, the possession by the subscribers of both telephones is a necessity. The business man, physician and lawyer cannot undertake to dictate to the persons with whom they are doing business which telephone must be used. It therefore becomes necessary, in order to do business generally, to have both telephones. This means a double expense for telephones. Ordinarily, competition reduces prices, but if, as is shown, by the evidence adduced before this committee, 60 per cent of the subscribers in localities where there is a double system must have two telephones, then, unless the price of each is less than one-half of the cost of proper telephone service, competition would result only in an increased price for telephone service.

"To your committee any of the reasons given for the granting of any of the applications above mentioned are equally applicable to all, and the reasons for not granting to any are alike applicable to all.

"We therefore recommend that the applications above mentioned are rejected.

"Respectfully submitted,

"JOSEPH SCHWENINGER,

"MICHAEL MULLEN,

"JAMES KEENAN,

"E. O. BATHGATE,

"LOUIS SCHUELER.

"Committee on Telephones, Telegraphs and Conduits."

"On January 25, 1904, the council of the city of Cincinnati adopted said report, and in pursuance thereof refused to pass the ordinance set forth in the petition.

"This defendant further says that at the time when said ordinance above referred to was presented to council for passage, three other companies, to wit, the Cincinnati Telephone Company, the Interstate Telephone Company and the Fitzsimmons Telephone Manufacturing Company presented to said council for passage ordinances fixing the mode of use of the streets of said city by said several companies; that said ordinances were referred to said committee on telephones, telegraphs and conduits, and on January 25, 1904, the council of the city of Cincinnati,

Telephone Co. v. Cincinnati.

in pursuance of the report of said committee refused to pass any of said ordinances presented by said companies; that thereupon, on the following day, January 26, 1904, the plaintiff herein and said three other telephone companies filed an application in this court, asking that this court fix the mode of the use of the streets of said city by said companies for telephone purposes, all of which actions are still pending.

"This defendant further says that all the streets in the city of Cincinnati, in the business portion thereof, and the majority of said streets in the residence portion and the outlying districts have been permanently improved, either with granite, asphalt, brick, bowlder or macadam; that in the various streets and highways of said city there is now an underground network of telephone, telegraph, electric light conduits, gas, sewer and water pipes, with the various manholes and fire cisterns used in connection therewith; that at the intersection of the principal streets such conduits, pipes, manholes and other structures now occupy so great a proportion of the streets that it is dangerous, if not impossible, to permit a further use of the streets, for such purposes; that in said city it is the uniform custom to permit property owners to utilize the space underneath the sidewalk as far as the curb for the purposes of their buildings; that in the continued growth of said city such space as is not now used for underground purposes will be necessary to be used in the extension of the system of underground purposes by the city and other persons now having a right to use the streets for such purposes.

"This defendant further says that the Cincinnati & Suburban Bell Telephone Company, a corporation under the laws of Ohio, now owns and operates a telephone exchange and system of wires for telephone purposes through conduits and upon poles in the streets and highways of the city of Cincinnati under an agreement with said defendant for the maintenance and use of telephone conduits and poles; that said company occupies all of the business portion and a large part of the residence portion with underground conduits, to wit, all that portion between Freeman and Egglestone avenue, and the Ohio river and McMicken avenue, together with many other thoroughfares leading in the suburbs of the city, and that with these facilities and pole lines in outlying portions it is able to, and it has supplied all the demands made or existing within the city for telephone service; that no further occupancy of the streets or highways is at all necessary for the purpose of such service, and that further occupancy for the same would incommode the public in the use of such streets and highways, and would cause additional expense to the residents and business concerns of the

city; and if the plaintiff were permitted to occupy and should occupy the streets and highways of the city for telephone purposes, and much more if the applicants aforesaid or any future applicants were permitted so to do, and should occupy said streets and highways, such occupancy would, in operation and effect, divert the said streets and highways; especially in the business portion of the city, from their original and legitimate purposes and uses, and prevent the further growth and extension of the uses to which the said city of Cincinnati ought to, and will, be compelled to apply them; and that under these circumstances and facts it was impracticable, as in substance and effect stated in the report above set out, for the city to formulate the terms of, or to enter into, an agreement with the plaintiff, or the other applicants above mentioned, for the occupancy of its streets and highways for the further telephone use and service, and that in consequence it did not unreasonably refuse to adopt the ordinance which plaintiff presented and sought to have passed either as the ordinance was written or as it could reasonably be amended. By reason thereof, said Cincinnati & Suburban Bell Telephone Company claims an interest in the streets and highways of said city superior to any right which plaintiff may acquire.

"This defendant denies all other allegations in plaintiff's petition not herein expressly admitted.

"Wherefore this defendant prays that said the Cincinnati Telephone Company, the Interstate Telephone Company, the Fitzsimmons Telephone Manufacturing Company and the Cincinnati & Suburban Bell Telephone Company be made parties herein, and be required to set up their several claims to rights in the streets of the city of Cincinnati, and for all other and proper relief.

"CHARLES J. HUNT, City Solicitor.

"(Duly verified.)"

To which said telephone company replied as follows:

"Now comes the plaintiff, and by way of reply to the defendant says that it admits that the ordinance transmitted to council by the plaintiff, was referred by council to its committee on telephones, telegraphs, and conduits in connection with the application of three other companies for passage of similar ordinances, and admits that said committee made the report set out in said answer, and that the council of the city of Cincinnati adopted said report on January 25, 1904, and refused to pass the ordinance described in the petition or any other ordinance, and refused to agree with the plaintiff herein as to the mode

and manner of occupying the streets of the city of Cincinnati for its purposes. And admits that at the time said ordinance above referred to was presented to council, three other companies presented similar ordinances to council, and denies each and every other allegation in said answer contained.

"C. B. MATTHEWS, Plaintiff's Attorney.

"(Duly verified.)"

The case was heard on evidence at length and argued by counsel and the court made the following finding and decree:

"This cause came on for hearing upon the pleadings and the evidence, and was argued by counsel and the court being fully advised in the premises, finds:

"First. That the plaintiff is a corporation incorporated and organized under the laws of the state of Ohio, for the purpose of building, owning, maintaining and operating a system of telephone and telegraph lines and conducting a telephone and telegraph business in the city of Cincinnati and elsewhere, and is authorized to bring this proceeding, and that the defendant is a municipal corporation and a city under the laws of this state.

"Second. That on October 12, 1903, the plaintiff by authority of its board of directors, applied to the defendant, through its council, for the purpose of coming to an agreement with said city as to the mode of use of the streets, alleys, public ways and other public property of, and within the limits of said city for its lines, but said city on January 25, 1904, refused to agree with the plaintiff upon the mode of use of such streets, alleys, public ways, and other public property for the purposes of its telephone and telegraph lines and system, upon any terms, and that it is necessary for said plaintiff to use said streets, alleys and public ways.

"Third. That all steps had been taken and all the events had transpired and happened at the time of the filing of the petition herein, authorizing the plaintiff to apply to this court to fix the mode of use of such streets, alleys, public ways and other public property for the purposes aforesaid. Therefore, the court, coming now to direct the mode of such use, directs that the plaintiff shall use the streets, alleys, public ways of and within the limits of said city of Cincinnati for its telephone lines and system in manner following, to wit:

"(a) That in the district of the said city bounded as follows: Along McMicken avenue from the intersection of McMicken avenue and Freeman avenue, to the intersection of McMicken avenue and

Main street; from there along Main street to the intersection of Main and Liberty streets; from there along Liberty street to the intersection of Broadway and Liberty street; from there along Broadway to the intersection of Broadway and Eggleston avenue; from there along Eggleston avenue to the intersection of Eggleston avenue and Third street; from there along Third street to the intersection of Third and Front streets; from there along Front street to the intersection of Front street and Freeman avenue; from there along Freeman avenue to the place of beginning, to wit, the intersection of McMicken and Freeman avenues, and in such other thickly settled portions of the city as said plaintiff may from time to time select; all its wires shall be placed in underground conduits or subways, and no poles shall be erected in said district or other portions of the city where the wires are placed in conduits, except for distribution of wires or cables from conduits or subways to buildings, and all such poles shall be, as far as possible, located in alleys, but in the portion of said district north of Liberty and east of Central avenue, pole lines may be erected in the localities not solidly improved.

"In the balance of the territory within the city limits said plaintiff is authorized to erect in the streets, alleys and public ways the necessary poles and string the necessary wires thereon for its telephone and telegraph lines, but reserving to the abutting property owners all their existing rights.

"The plaintiff in constructing its system is authorized to construct all conduits, pole lines, abutments, manholes, and house and exchange connection in the respective districts above named necessary to make its system a complete working system of telephonic communication.

"(b)   All poles which are to be used and erected by the plaintiff shall be smooth and painted, and shall be located and erected under the supervision of the board of public service of said city and to its satisfaction, and the wires shall in no case approach nearer than twenty-five feet to the surface of any street, alley, public way, or private driveway over or along which the line or lines of said plaintiff may pass, and all lines, poles and conduits shall be so placed as not to injure other telephone and telegraph lines and other structures lawfully occupying said streets, alleys or ways, either overhead or under the surface; and shall be further so placed so as not to obstruct the access or abutting property to gas mains, water mains and sewers, or other structures in said streets to which said abutting property owner has a right of access.

Telephone Co. v. Cincinnati.

"(c) If at any time any of the poles or conduits erected by the plaintiff under the provisions of this decree shall interfere with the public use of any of the said streets or property of the city so that it would be proper and advisable to order a change therein, the said city may require the plaintiff to change the location or construction of said pole or poles or conduits to some other practicable location or design, without expense to the city.

"(d) From time to time said plaintiff shall, before entering upon the construction of the contemplated work, file with the board of public service plans showing the location and character of the work designed to be constructed, but if there is anything improper in the location or design shown by said plans, said board shall not be deprived of its power to change the same so as to adjust the location and character of the work to meet the conditions existing at the particular locality, and unless so changed within ten days, permits shall be issued for the construction thereof.

"(e) Said plaintiff shall, upon written notice from the proper authorities of said city, that any local improvement, sewer or water main is to be repaired or constructed in such a manner as will require the removal or altering of any pole or poles, conduit or conduits, remove and change the same without cost to the city, so as to permit the construction or repairing of said improvement where ordered.

"(f) All work shall be done in a thoroughly workmanlike manner, and of the best materials; and the board of public service shall prescribe the manner of restoring the streets, alleys and public ways, and shall be permitted to appoint an inspector or inspectors, at plaintiff's expense, to supervise the work of restoration.

"(g) Before any work is commenced, the plaintiff shall give a bond of not less than $100,000 to be executed by a surety company and to be approved by the board of public service, conditioned that the plaintiff will restore all streets, alleys and public ways where excavated by it, and that the points and along the lines of excavation, said plaintiff will, for a period of three years thereafter, keep the excavated parts in repair, and that the plaintiff will save the city harmless from any liability arising out of the construction or alteration of the plaintiff's telephone system.

"(h) One duct in the conduits and one cross-arm on the plaintiff's poles shall be reserved to the city for use for its police and fire alarm service wires.

"The plaintiff shall file in court its written acceptance of the terms

prescribed within twenty days from the entry of this order, and shall pay the cost of this proceeding.

"To all of which the defendant excepts, and the defendant having given its notice of appeal to the court of common pleas, the court fixes the amount of the appeal bond at $500."

The city of Cincinnati prosecuted error to the court of common pleas and that court reversed the judgment of the probate court. The opinion of Littleford, J., is found in *Cincinnati* v. *Telephone Co.* 15 Dec. 43.

Did the court of common pleas err in its judgment of reversal?

Some of the questions presented in this record have been before the Supreme Court of our state, in the case of *Zanesville* v. *Telephone & Tel. Co.* 63 Ohio St. 442 [59 N. E. Rep. 109], and *Zanesville* v. *Telegraph & Tel. Co.* 64 Ohio St. 67 [59 N. E. Rep. 781; 52 L. R. A. 150; 83 Am. St. Rep. 725].

In *Zanesville* v. *Telephone & Tel. Co., supra,* the court by a divided court, held Lan. R. L. 5587 (R. S. 3461) unconstitutional, and on a rehearing, the same court, two judges dissenting, held said section constitutional.

The telegraph and telephone company made application to the city council of Zanesville for an ordinance for the use of the streets of said city in order to carry on its business in said city. Said council refused to come to any agreement with said company, and thereupon said company filed its petition in the probate court of Muskingum county for an order under said section. Upon a hearing, said court held the law to be unconstitutional and dismissed the proceeding. This judgment was affirmed by the court of common pleas. The judgment of affirmance was reversed by the circuit court of said county. In *Zanesville* v. *Telephone & Tel. Co. supra,* the judgment of the circuit court was reversed and on a rehearing in *Zanesville* v. *Telegraph & Tel. Co. supra,* the judgment of the circuit court was affirmed. The only question considered by the Supreme Court in both decisions, it might be said, was whether said section was constitutional. The probate court had so held and dismissed the petition of the company for the reason that the section was unconstitutional. In *Zanesville* v. *Telephone & Tel. Co.,* the opinion and judgment of the court is that said section is void because it is unconstitutional. In *Zanesville* v. *Telegraph & Tel. Co.,* the section is held to be constitutional.

In *Zanesville* v. *Telegraph & Tel. Co.,* the court say, at page 72:

"The only question that has engaged the attention of counsel and the court on each of the hearings, is whether that provision of Sec.

3461 Rev. Stat., which confers jurisdiction on the probate court to direct the mode of constructing a telegraph or telephone line, in the streets of a municipality when its authorities and the company are unable to agree, is repugnant to the constitution of the state; and the sole ground of the attack upon the constitutionality of the provision alluded to, is that the power it purports to confer on the court is purely legislative in character."

The first proposition in the syllabus in the case of *Zanesville* v. *Telegraph & Tel. Co. supra*, is as follows:

"The distribution of the powers of the state, by the constitution, to the legislative, executive, and judicial departments, operates, by implication, as an inhibition against the imposition upon either of those powers which distinctively belong to one of the other departments."

The second proposition is as follows:

"The fact that a power is conferred by statute on a court of justice, to be exercised by it in the first instance in a proceeding instituted therein, is, itself, of controlling importance as fixing the judicial character of the power, and is decisive in that respect unless it is reasonably certain that the power belongs exclusively to the legislative or executive department."

And the third proposition is as follows:

"The institution and prosecution of a proceeding in a court, comprehends the filing of a proper complaint, process for bringing in the proper parties, and a judicial inquiry according to established rules and practice."

These three propositions are the basis of the decision. The court in the opinion, discusses Lan. R. L. 5576, 5584, 5585 (R. S. 3456, 3458, 3459), and says that Lan. R. L. 5587 (R. S. 3461) is not different in its nature from Lan. R. L. 5585 (R. S. 3459).

It is evident from a reading of Lan. R. L. 5585 (R. S. 3459) that any matter brought before the probate court under this section must be concrete and the court may render judgment as to any particular and definite place or places and a decree in general and not dealing with any particular place or places would seem to be outside of the provisions of the statute, and would be legislative in character.

A careful reading of Lan. R. L. 5587 (R. S. 3461) clearly shows what is to be determined by the probate court. When the municipal authorities and the company cannot agree, it is something concrete and definite, and not general. The language is:

"When any lands authorized to be appropriated to the use of a company are subject to the easement of a street, alley, public way,

or other public use, within the limits of any city or village, the mode of use shall be such as shall be agreed upon between the municipal authorities of the city or village and the company; and if they cannot agree, or the municipal authorities unreasonably delay to enter into any agreement, the probate court of the county, in a proceeding instituted for the purpose, shall direct in what mode such telegraph line shall be constructed along such street, alley, or public way, so as not to incommode the public in the use of the same; but nothing in this section shall be so construed as to authorize any municipal corporation to demand or receive any compensation for the use of a street, alley, or public way, beyond what may be necessary to restore the pavement to its former state of usefulness.''

And while all the streets of a municipality might be subjected to the use of the company by the probate court in a proper case under this section that could only be done by a consideration of each street or alley. In other words, the section does not contemplate that the probate court is to make general regulations as to all the streets of a municipality. This would be legislative.

The two cases cited by the court in *Zanesville* v. *Telegraph & Tel. Co. supra*, as authorities in accord with the decision of the court, deal with a definite and concrete subject,—both are bridge cases. One is as to the use of a particular bridge, and the other is as to the height of a span of a bridge across the Ohio river at a particular place.

In *Zanesville* v. *Telephone & Tel. Co. supra*, the court cite *Norwalk St. Ry., Appeal of*, 69 Conn. 576 [37 Atl. Rep. 1080; 38 Atl. Rep. 708; 39 L. R. A. 794], as sustaining its holding that Lan. R. L. 5587 (R. S. 3461) is unconstitutional, but in *Zanesville* v. *Telegraph & Tel. Co. supra*, the court hold that that case had no application to our statute for the reason that the statute of Connecticut by its provisions, transferred to the court by appeal, all the powers originally vested in council and that the court thereby became vested with legislative and not judicial powers.

It is quite clear from these decisions that this section, Lan. R. L. 5587 (R. S. 3461), is constitutional, and in a proper case the probate court has jurisdiction to render a judgment, but that judgment must be a judicial determination according to established rules and practice, and not a general grant as to the use of all the streets of a municipality which would be legislative and simply a substitution of a court for a council.

The distinction between the legislative and the judicial powers of the state, is adhered to as strictly in *Zanesville* v. *Telegraph & Tel. Co. supra*, as in *Zanesville* v. *Telephone & Tel. Co. supra*.

Telephone Co. v. Cincinnati.

The question must arise in every case, however, whether the court has exercised the power granted under this section in a proper manner. If the court has decided a judicial question, it is within the power of the statute; if then, on the other hand, the court has gone beyond and without the statute and assumed legislative powers, it is without the statute and to such extent void.

This brings us to a consideration of what was done in this case.

The petition alleged that on October 12, 1903, the Queen City Telephone Company made application to the city council of the city of Cincinnati, under the laws of the state, to prescribe a manner of use by this company, of the streets, alleys and public ways and other public property of the said city, in constructing the plaintiff's lines, telegraph and telephone, and transmit at the same time, a form of the ordinance that this company was willing to accept.

The prayer of the petition asked that the court direct in what mode the plaintiff may construct its telephone and telegraph line along the streets, alleys, public ways, and public property of the said city of Cincinnati.

The gist of the answer is, that as to the principal streets of the city, it would greatly incommode the public and would be dangerous to the public. This was denied by the telephone company. On the trial, the city offered evidence at length of a high character to sustain its allegations, and the defendant offered evidence to rebut this. So that here was an issue presented in the pleadings for the court to determine according to the evidence.

We look in vain through the *decree* of the court for any judgment on the issues joined. This is no judicial determination of a judicial question. It is not a finding and the judgment thereon. It is not in substance or in form, a decree. In form and in substance, it is nothing more than an ordinance, an act of legislation, in the name of a decree. This was not intended by Lan. R. L. 5587 (R. S. 3461), and if intended, would be unconstitutional. The court clearly misapprehended its power.

Has this telephone company the right "to construct and maintain underground wires and pipes or conduits, and other fixtures for containing, protecting and operating such wires in the streets and public ways" of the city of Cincinnati? If it has any such right, it must be found to have been clearly granted by statute. The right of eminent domain rests in a grant. If not granted, there is no power. Laning R. L. 5602 (B. 3471-1) provides that it shall be unlawful for any corporation, com-

pany or individual, to erect any telephone or telegraph pole or poles within that portion of any city in this state, when subways have been constructed.

In a large portion of the city of Cincinnati, subways have been constructed and were in use for telegraph and telephone purposes before this suit was brought.

The first provision, by the legislature of Ohio was passed February 8, 1847, authorizing the construction of electric telegraph lines. Act 45 O. L. 34 (Lan. R. L. 5577; B. 3461-1), Sec. 1, is as follows:

"[Lines of electric telegraphs may be constructed in any place so they do not incommode the public.] Any person or persons may be and are hereby authorized to construct lines of electric telegraphs, from point to point, upon and along any of the public roads and highways, and across any of the waters within the limits of this state, by the erection of the necessary fixtures, including posts, piers, or abutments for sustaining the cords or wires of such lines; provided, that the same shall not in any instance be so constructed as to incommode the public in the use of said roads or highways, or endanger or injuriously interrupt the navigation of said waters; nor shall this act be so construed as to authorize the erection of any bridge across any of the waters of this state."

This was followed by a further grant of the legislature on May 1, 1852 (50 O. L. 287; S. & C. 299; Lan. R. L. 5574; R. S. 3454) and is as follows:

"[Powers of companies.] A magnetic telegraph company heretofore or hereafter created may construct telegraph lines, from point to point, along and upon any public road, by the erection of the necessary fixtures, including posts, piers, and abutments necessary for the wires; but the same shall not incommode the public in the use of such road."

They are in substance the same and the first provision not having been repealed, they should be read together.

It is a well settled rule of construction that a statute must be read in the light of the conditions that existed at the time of the passage of the act in order to ascertain the meaning of the legislature. And in matters of this kind, the court will take judicial notice of such conditions. The common ordinary way in which telegraph lines were constructed and used, in Ohio, and elsewhere in the United States, at the time of the passage of these acts, and up to the present time, was by an aboveground or overhead construction by means of posts or poles set in the ground upon which wires were sustained. This mode and construction of telegraph lines is now universal in all points of Ohio, except in a few of the most populous cities of the state and it still largely prevails in the

most populous cities except upon certain of the busiest streets; and this is the condition in the city of Cincinnati today and up until the passage of Lan. R. L. 5602 (B. 3471-1), Sec. 1, in 1891, the construction was all overhead.

Read with reference to the conditions that have existed in this state up to the passage of the last named section in 1891, there seems no reason to doubt but what the mode of construction provided for in Lan. R. L. 5574, 5577 (R. S. 3454, 3461-1), Sec. 1 was an overhead construction, by means of posts planted in the ground upon which wires or cords were strung. Every word used in these sections is appropriate to describe such a construction and no word indicates any other idea, unless it is the word, "fixtures," but evidently this word is used in connection with the words, "posts, piers and abutments," and are such fixtures as would be necessary and proper for an overhead construction.

The legislature having clearly expressed itself as to one mode and manner of construction of telegraph lines, by fit and apt language, it would only be reasonable to conclude that if another and entirely different mode of construction was intended to be granted, other and different words would be used which would clearly describe the other and different mode of construction. These sections remained unaltered from the time of their passage until April 8, 1891, when Lan. R. L. 5602 (B. 3471-1), Sec. 1, was passed. During all this time, all over the state and in every city, village and hamlet, telegraph and telephone companies constructed and maintained a pole or overhead construction. But there came a time when this mode of construction in certain of the busiest portions of our cities, greatly discommoded the public, and was difficult to be maintained by the corporation and a new mode of construction and operation of these lines became necessary and the result was that the legislature on April 8, 1891, passed the following act, 88 O. L. 296:

"Section 1. *Be it enacted by the general assembly of the state of Ohio,* that any company organized under the laws of this or any other state, and owning and operating a telephone exchange in any city in this state, may construct and maintain underground wires and pipes, or conduits and other fixtures for containing, protecting and operating such wires in the streets and public ways of the said city, when the consent of such city has been obtained therefor."

This act provides that any company organized under the laws of this or any other state and owning and operating a telephone exchange in any city of the state, may construct and maintain underground wires and pipes or conduits and other fixtures for constructing such wires in the

streets of said city. It will be noticed that this law made no provision for an underground construction for telegraph companies.

This law was amended May 8, 1894, 91 O. L. 205, (Lan. R. L. 5602; B. 3471-1), Sec. 1. This section as it now stands provides that any company organized under the laws of this state or of any other state and owning and operating a telephone exchange or doing a telegraph business in any city in this state, may construct and maintain underground wires and pipes or conduits and other fixtures for containing, protecting and operating such wires in the streets and public ways of said city, when the consent of such city has been obtained therefor. The section further provides that it shall be unlawful for any company to erect any telephone or telegraph pole or poles within that portion of the city where subways have been constructed. It further provides that the act shall not apply to existing telegraph companies until such companies have authority and time to construct subways. It must be conceded that this section, as it now stands, is, in effect, a legislative declaration that the right to any telephone or telegraph company to construct and maintain underground wires in pipes or conduits in any street, in any city, in this state, did not hitherto exist, and that the companies who are granted these rights by this section, get such rights by virtue of this section, and none other, and that any company that does not come under the provisions of this section, has no right to construct and maintain an underground system.

I think there can be no question but what this section applies to telephone and telegraph companies in existence at the time of the passage of the act, as well as to those companies which may come into existence after its passage. The language is, "any company owning and operating a telephone exchange or doing a telegraph business in any city in this state." This language would apply as well to companies in existence as to those which may afterwards come into existence. If there could be any question as to this, it would seem to be made clear by the proviso contained in the section which reads as follows: "Provided that this section shall not apply to existing telegraph companies until such companies shall have authority and sufficient time to construct subways." If this section only applied to existing companies, there would be no occasion to speak of "existing telegraph companies;" furthermore, there could be no reason why it should not apply to now existing as well as to pre-existing companies. Whether the company was in existence or not could not be of importance; the most important matter was the placing of the wires underground in the streets of the city, when the consent of the city was obtained. It would be difficult to understand why it would be necessary

Telephone Co. v. Cincinnati.

for a company in existence, which owned and operated a telephone exchange in a city, to first obtain the consent of the city to place its wires in conduits under ground, while a company not then in existence and which was not owning and operating a telephone exchange, might place its wire in conduits underground in the streets of a city without the city's consent.

We must therefore look to the act, and ascertain what companies may, when the consent of the city is obtained, construct and maintain underground wires in pipes and conduits in the streets and public ways of the city.

The statute says that any company organized under the laws of this or of any other state and owning and operating a telephone exchange, or doing a telegraph business, in any city in this state, may construct and maintain underground wires and pipes or conduits, etc., with the consent of the city. It is admitted that the Queen City Telephone Company did not own and operate a telephone exchange in the city of Cincinnati. It must therefore be apparent that this company can have no right to construct an underground system by virtue of this section, for the section clearly and specifically says, that any telephone company owning and operating a telephone exchange and any telegraph company doing a telegraph business in any city in this state, may, with the consent of such city, use the streets for underground wires.

There does not seem to be any room to question what is meant by the words used in this act. The statement is plain and direct to the effect that a telephone company owning and operating a telephone exchange and a telegraph company, doing a telegraph business in any city in this state, may construct and maintain underground wires. There is no authority given to any other kind of a company to construct and maintain underground wires in the streets of any city in this state. Many reasons might be given why the legislature has limited the right to telephone companies owning and operating a telephone exchange and to telegraph companies doing a telegraph business in the cities in the state, to use an underground system of wires in the streets of the cities of the state, but with the wisdom of the act, the court is not concerned, for that is within the province of the legislature. If the meaning of the act is clear and certain, the only duty resting on the court is to give it effect and carry it into execution. If, however, the meaning is indefinite and uncertain, the court may well consider the reasonableness of any construction contended for in order to ascertain the true meaning of the act, but the meaning of this act is too plain to admit of question.

If I am correct in my conclusions, this company has no right to

construct and maintain underground wires in any city in this state. It does not have any such right given by Lan. R. L. 5574, 5577 (R. S. 3454 and 3461-1), Sec. 1, which we hold only authorized a pole or overhead construction, and it does not get any such right from Lan. R. L. 5602 (B. 3471-1), Sec. 1, for that section confers such right only on a telephone company owning and operating a telephone exchange, and this company does not own and operate a telephone exchange in this city, and these sections are the only ones found in our statute which purport to grant to such companies power to construct and maintain these lines.

Another question has arisen in the case, and that is, as to the right of the Queen City Company to maintain the action in the probate court.

We are of the opinion that this case should come under the rule as laid down in the case of *Powers* v. *Railway*, 33 Ohio St. 429, wherein it is held that:

"Where a railroad company proceeds to appropriate lands for its use, it is essential to a judgment of condemnation that it should prove its corporate existence, and that it has complied with the law giving it the right to exercise the power of eminent domain.

"It is essential to the exercise of eminent domain for the company to prove that it has fully organized by the election of directors."

In *Zanesville* v. *Telegraph & Tel. Co. supra*, our Supreme Court say, that this action is in the nature of an appropriation proceeding, and this being so, we see no reason why it should not apply as well to a telephone company as a railroad company.

Without going into a review of the facts, in this case, we deem it sufficient to say that the law of the state applicable to the formation of the company and the election of directors, has not been fully complied with.

Judgment of the court of common pleas affirmed.

Giffen, J., concurs.

**JELKE, J.**

I concur in the conclusion reached by Swing, J., especially in his construction and application of Lan. R. L. 5587 (R. S. 3461).

While the question of the constitutionality of this section is not open to us, having been determined by the Supreme Court to be constitutional, I am of opinion the action of the probate court herein was an unconstitutional construction and application of that law.

The decree of the probate court was pure municipal legislation, and no act to the legislature can make an act legislative in its very essence, judicial in nature, and no construction or application of a constitutional

Telephone Co. v. Cincinnati.

law should be made or can constitutionally be made which would work out that effect.

I dissent from that part of the opinion which limits the combined application of Lan. R. L. 5574, 5602 (R. S. 3454, 3471-1) to overhead construction and companies now in existence and having and operating a switch board or exchange, as such construction would be contrary to the constitution as tending to create a monopoly.

I further concur in the conclusion that the Queen City Telephone Company was not properly organized to apply for or to receive a grant.